CALIFORNIA & EASTERN S. S. CO. v. 138,000 FEET OF LUMBER, etc. (WILLIAM C. DORSEY & SONS CO., Intervener).

District Court, D. Maryland. November 18, 1927.

No. 1456.

1. Admiralty ⟜16—Admiralty court has no jurisdiction of vessel's claim for demurrage paid railroad for use of cars into which cargo was unloaded; there being no maritime lien, notwithstanding agreement.

Vessel has no maritime lien for demurrage charges paid to railroad company for use of cars into which cargo was unloaded, and such nonmaritime claim cannot be changed into maritime lien by agreement of parties in bill of lading, so that admiralty court has no jurisdiction of such claim.

2. Shipping ⟜154, 185—Vessel has lien on cargo for ocean freight and demurrage.

It is universally recognized in United States that vessel has lien on cargo for ocean freight and demurrage.

3. Shipping ⟜154, 185—Vessel's expressly retained lien on cargo for ocean freight and demurrage is not lost by delivery.

Vessel's lien on cargo for ocean freight and demurrage is not lost by delivery, if vessel expressly retains it.

4. Shipping ⟜170—"Demurrage," in maritime sense, is charge allowed vessel for delaying her in unloading.

"Demurrage," in maritime sense, is charge allowed to vessel for delaying her in unloading, in nature of compensating her for freight she might have earned, had she not been so delayed.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Demurrage.]

5. Shipping ⟜154—Basis of lien for "dead freight" is directly related to vessel's services, as distinguished from "demurrage" to railroad after cargo is unloaded.

In maritime sense, the expression "dead freight" is used to denote compensation payable to owner when charterer failed to ship full cargo, and assuming valid lien for dead freight may be created by agreement in charter or bill of lading, basis of such lien is directly related to vessel's services, as distinguished from demurrage paid railroad for use of cars into which cargo is discharged.

[Ed. Note.—For other definitions, see Words and Phrases, Dead Freight.]

6. Carriers ⟜100(1)—Railroad ordinarily has no claim against vessel for demurrage for use of cars into which cargo was discharged.

Railroad normally, in absence of special arrangements, has no claim which it may assert against vessel or her owner for demurrage for use of cars into which cargo is discharged at pier, but its rights would lie against shipper or consignee.

In Admiralty. Libel in rem by the California & Eastern Steamship Company against 138,000 feet of lumber ex steamship West Keats, in which the William C. Dorsey & Sons Company intervened. Libel dismissed.

Janney, Ober, Slingluff & Williams, of Baltimore, Md., for libelant.

John H. Skeen and Charles Lee Merriken, both of Baltimore, Md., for respondent.

COLEMAN, District Judge. This is a libel in rem by the California & Eastern Steamship Company against a cargo of lumber carried from Portland, Or., to Baltimore, aboard one of its vessels, the West Keats, whereby libelant seeks to recover certain demurrage charges paid to the railroad company for the use of its cars into which the lumber was discharged at the pier upon the vessel's arrival.

The material facts are not in dispute. The lumber was consigned to the order of the shipper, the Chapman Lumber Company, notify the Burgan Lumber Company, at Baltimore. This latter company sold the cargo to the claimant Dorsey while it was still en route in the vessel, and upon arrival at Baltimore was discharged into railroad cars which had been spotted at the pier at the request of the notify consignees; the vessel at the same time giving written notice to the railroad company that it retained its lien for ocean freight and other charges, and to the notify consignees and claimant that any railroad demurrage charges accruing would be for their account. Notice was given to the claimant Dorsey, by the notify consignees, that bills of lading covering the shipment were held for his order subject to the ocean freight and railroad demurrage. Dorsey refused, for some days, to accept delivery, claiming that he was unable to identify this particular shipment. However, after some correspondence, identity was established to his satisfaction, and he agreed to take the lumber, but refused to pay the railroad demurrage charges.

Thereupon libelant refused to allow the lumber to be released, claiming a lien for the railroad demurrage, and claimant instituted replevin proceedings, secured the lumber under bond, and paid the ocean freight. Libelant paid the railroad company its demurrage charges and thereupon filed this libel against claimant Dorsey and the cargo to recoup itself. The libel was subsequently amended, dismissing Dorsey and continuing the action in rem only against the cargo. Claimant Dorsey has intervened, excepting to the jurisdiction of this court on the ground that the subject-matter of the libel is not maritime, and,

even if maritime, it does not give rise to a maritime lien.

The bill of lading contained the following provisions which are pertinent to the issue:

"When the goods are free of the vessel's tackle or have been lifted by cranes upon craft or shore, the delivery by the shipowner shall be considered complete and the liability of the shipowner shall altogether cease and thereupon the goods shall be at the risk and expense, for all purposes, and in every respect, of the shipper, consignee or owner. If the goods are not taken away the same day by the shipper, consignee or owner, they may, at the option of the vessel's agents, be sent to store or warehouse, or be permitted to lie where landed at the expense and risk of the shipper, consignee or owner."

"The owner, shipper, consignee, of the goods and the holder of this bill of lading shall be jointly and severally liable for all freight and charges and expenses of every kind whatsoever, whether payable in advance or not, that are stated to be or may be incurred herein by the cargo; and all such charges and expenses shall be due and payable day by day immediately when they are incurred, and the shipowner shall also have *a lien for them and the freight on the cargo*. (Italics inserted.) This lien may be enforced by public or private sale in any manner in the shipowner's discretion. The owner, shipper, consignee, or holder of this bill of lading will pay all such freight and charges and expenses in full, and without any offset, counterclaim, or reduction, but without prejudice to any claim against the shipowner for breach of contract hereunder."

[1] The basis of respondent's exceptions, which will be treated together, because they are substantially one and the same thing, is that any support for a maritime lien must be found either in the general maritime law or in some statutory enactment; that the present claim is beyond the jurisdiction of this court, since it is for storage of cargo on land after its discharge from the vessel; that no lien is given, either by the general maritime law or by statute, to a vessel for the storage of goods after the completion of her voyage; and that such a nonmaritime claim cannot be changed into a maritime lien by mere agreement of the parties, namely, by provisions inserted in the bill of lading. In support of this contention, respondent relies upon such cases as The Richard Winslow (C. C. A.) 71 F. 426; The Saratoga (C. C. A.) 204 F. 952; The Athinai (D. C.) 230 F. 1017; Gowanus v. United States Shipping Board (D. C.) 271 F. 528.

In reply to this contention, libelant asserts that while the lien which the vessel in this case seeks to enforce arises by reason of the terms of the bill of lading, it is not a true maritime lien which is by nature a secret hypothecation independent of possession, and following the res unqualifiedly, but rather a possessory lien, which may be, and is frequently, created by agreement between the parties and when so created, is enforced in the admiralty courts. In support of this contention libelant relies upon such cases as 4,885 Bags of Linseed, 1 Black, 112, 17 L. Ed. 35. The Saturnus (C. C. A.) 250 F. 407, 3 A. L. R. 1187; The Maggie Hammond, 9 Wall. 435, 19 L. Ed. 772. Libelant seeks to liken the present claim especially to a lien for dead freight, given by a charter or bill of lading and which has been recognized in the English admiralty courts (Porteus v. Watney, 47 L. J. Q. B. 643), although the maritime law itself gives no lien for dead freight. The Saturnus, supra, 411 and 412.

[2-4] The court is not impressed with the distinction sought to be made by libelant. It is undoubtedly true that a vessel's lien is now universally recognized in the United States on the cargo for ocean freight and demurrage. The Hyperion's Cargo, Fed. Cas. No. 6,987, 2 Lowell, 93; The Saturnus, supra. It is also well settled that such a lien is not lost by delivery if the vessel expressly retains it. 4,885 Bags of Linseed, supra. But these principles are not decisive of the specific question here presented, which is one not relating to any charges connected with the vessel's services, but solely with the services of a third party, namely, the railroad, after the cargo has been discharged. Demurrage in a maritime sense is a charge allowed to a vessel for delaying her in unloading, in the nature of compensating her for the freight she might have earned, had she not been so delayed. J. E. Owen (D. C.) 54 F. 185; The Saturnus, supra. True, demurrage is allowed to a land carrier on the same principle; but it has nothing to do with the services rendered by the vessel. The cases relied upon by libelant above cited do uphold the principle that the vessel has a lien upon the goods for freight, demurrage, and *other charges;* but in no case cited, nor in any that have been found, have such other charges been entirely unrelated to the services of the vessel, as are the charges in the present case. It is true, it was said in The Maggie Hammond, supra (page 450), that "shipowners contract for the safe custody, due transport, and right delivery of the cargo, and for the performance of their contract the ship, her

apparel and furniture, are pledged in each particular case, and the shipper, consignee, or owner of the cargo, contracts to pay the freight and charges, and to the fulfillment of their contract the cargo is pledged to the ship, and those obligations are reciprocal, and the maritime law creates reciprocal liens for their enforcement." But that case merely held that, when a vessel is disabled in the course of a voyage and cannot be seasonably repaired to perform it, her master is bound to transship the goods and send them forward in another vessel, if one can be reasonably procured; in other words, that the owner of the cargo has a lien upon the ship for the safe custody, due transport, and right delivery of the same. The question here involved was not before the court. Nor was it before the court in any of the other cases to which we have been referred. The case of Howard v. 9,889 Bags of Malt (D. C.) 255 F. 917, to which libelant refers, was reversed by the Circuit Court of Appeals (262 F. 946); the higher court holding that, where a vessel had departed after discharging her cargo and storing it in the name of the consignee, the vessel lost her lien, even for ocean freight, against the cargo, in the absence of a definite agreement with the consignee that the vessel's lien should continue.

[5] Even assuming, without deciding, that, as libelant contends, a valid lien for dead freight may be created in the United States by agreement in a charter or bill of lading, although not otherwise existing, the analogy is so imperfect as not to be convincing. The expression "dead freight" is used to denote the compensation payable to a shipowner when the charterer has failed to ship a full cargo, namely, compensation for the loss sustained by the shipowner by reason of the charterer's failure to deliver the agreed quantity of cargo. Clearly, the basis of such lien is directly related to the vessel's services, whereas railroad demurrage bears no such relation. The court fails to see any distinction on principle between the situation in the present case and that which existed in The Saturnus, supra, where the court held there could be no lien on a vessel for damages resulting from its failure to load at the specified place; the vessel and the cargo never having assumed the relations which give rise to a mutuality of lien, because the cargo was never put aboard. The following language of Judge Hough, in closing his opinion in this case, is pertinent (page 414):

"In respect of carriage of goods in particular, every public benefit has for centuries

been deemed obtained when goods were liable for freight, and ship for safe and sound delivery of goods, the mutuality of relation thus growing out of the act of transport, not the making of a contract for transportation. Anything more than this multiplies secret liens and hampers instead of advances ease and freedom of commerce. Merchant and mariner alike subject their property to the municipal law of every country into which their venture comes, but a maritime lien is as near an approach to jus gentium as can be found in private jurisprudence, and any extension thereof not internationally well founded is to be opposed as jealously as is a denial of its accepted extent."

Granting that the case of The Richard Winslow and the Gowanus Case, supra, relied upon by respondent, are not really closely analogous, because they merely decide that an admiralty court has no jurisdiction over contracts to procure permanent or lengthy storage of goods, either on the vessel after the voyage has been completed, or on land, there are other analogies of the law which strongly tend to support the view which the court takes in the present case. For example, prior to the Act of June 23, 1910, 36 Stat. 604 (Comp. St. §§ 7783–7787), giving a maritime lien for repairs furnished to domestic vessels, a maritime lien against such vessel could not by agreement be created for repairs furnished to such vessel, good as against subsequent owners. The Saratoga, supra. Similarly, it is beyond the power of a state to create a lien enforceable in admiralty by process in rem against a foreign ship. The Athinai, supra.

[6] The court, therefore, decides that it is not possible to bring the present claim within the cognizance of admiralty jurisdiction by mere agreement that it shall be so brought. The payment for which reimbursement is claimed in this case, appears to have been entirely a voluntary one on the part of the vessel. A railroad normally, in the absence of special arrangement, would have no claim which it could assert against the vessel or her owner, because its rights would lie against the shipper or consignee of the lumber; and here it is pertinent to note that it is quite doubtful whether the bill of lading did actually amount to an agreement, as libelant contends, that the vessel should be reimbursed for any such charges that might be incurred by it. It is true that, by the second provision of the bill of lading above quoted, the owner, shipper, or consignee, or the holder of the bill of lading, is declared to be liable "for

all freight charges or expenses of every kind whatsoever, whether payable in advance or not, that are stated to be, or may be, incurred herein by the cargo." But the first provision above quoted recites that, as soon as the cargo has been placed upon craft or shore, delivery shall be considered complete, "and the liability of the shipowner shall altogether cease, and thereupon goods shall be at the risk and expense, for all purposes and in every respect, of the shipper, consignee, or owner." In short, it seems to the court at least very doubtful whether the facts sustain the contention of the libelant.

However, it becomes unnecessary to rest the case upon this ground, because, as above explained, the exceptions are well founded on the point of lack of jurisdiction, and are therefore sustained, and a decree will be signed dismissing the libel.